This Honorable Appellate Court for the 2nd District is now open. The Honorable Justice Robert D. McLaren presiding, along with Justice Anne B. Jordan and Justice George Bridges. The case is number 219-0955, Derek Bretman, plaintiff appellant, v. Virgil Cook and Son, Inc., et al., defendants appellees. Arguing for the appellant, Milo W. Lundblad. Arguing for the appellee, Plote Construction, Inc., Julie A. Tuescher. Arguing for the appellee, Virgil Cook and Son, Inc., Paul V. Esposito. Mr. Lundblad, you may proceed. Thank you, Your Honor. Good morning, judges and also opposing counsel. As announced, my name is Milo Lundblad and I represent the plaintiff, Bretmans, in this case. I'd like to start out with that under Illinois law, Illinois has adopted what is called the Manual on Uniform Traffic Control Devices. And this set of standards applies to traffic signals and in particular, the traffic signals that were erected and operating at the intersection where the crash occurred giving rise to this lawsuit at Illinois 47 and Kreutzer Road in Huntly. More specifically, the same standards were adopted by the IDOT District 1, which encompasses this intersection. Section 4D.15 mandates that no traffic signal ahead can be more than 25.6 feet above the highway. This is not a suggestion, it's not a guidance, it's a mandate and it must be adhered to. The undisputed evidence in the record at this point is that based on the measurements of plaintiff's expert, Dr. J. Prisbilla, Plote, which was a general contractor who hired Virgil Cook and Sons to actually install the temporary lights that were governing the intersection at the time of the crash, installed the lights at heights that were too high. The heights of the lights violated the mandate of Section 4D.15. The signal head that was right over the lane of traffic that Mr. Vila was traveling in was 29 feet in the air, which is 3.4 feet too high. The one in the adjacent lane to his right was 32 feet in the air, also way too high. When the defendants moved for summary judgment, the primary argument was on whether or not the lights being in an improper position were a proximate cause of the crash. The trial court judge, in his opinion, decided that the lights in that position, a violation of the MUTCD standard, could not have been a proximate cause, and specifically the court looked at the actual cause prong of proximate cause and decided that 100% of the fault rested with Vila, the driver, based on the fact that in the court's opinion, the traffic signal was visible. Therefore, Mr. Vila could not claim that he looked but did not see. It's our position that the trial judge, in order to reach this conclusion, had to, in fact, decide issues of fact which are more proper for a jury. I would point out that this is not a case where Mr. Vila looked but did not see. Instead, this is a case where Mr. Vila looked at the array of traffic signals that were ahead of him but looked at the wrong one. In this instance, Mr. Vila looked in the right place where he expected traffic signals to be, but instead of the functioning lights, he saw the new permanent lights that were not yet operational and were covered with tarp. It's our belief that the evidence in the record shows that the misplacement of the lights, in fact, was a look at the wrong set of lights. Then, as a consequence of that, he had to go through a number of perceptions and searches which exhausted the amount of time he had available so that when he finally saw the functioning red light, it was too late for him to stop and too late for him to avoid the crash. Now, there's testimony in the record of four different experts, Joseph Emery of Civil Tech, Dennis Gouge of IDOT, and Jay Prisbilla, a retained expert, along with Dr. David Noyce, another expert. In any they have a strategic purpose of making sure that lights are visible, that Mr. Emery testified that the purpose of limiting the height of signals is to maximize visibility and conspicuity. He said further that the obvious reason is that if a driver fails to see a light, it can lead to an accident. And also, Mr. Emery agreed that if a red signal is too high and outside the field of vision, it could cause an accident. A similar opinion was expressed by Dennis Gouge, who's with IDOT, and Jay Prisbilla. In addition to that, the plaintiffs offered the testimony of Dr. David Noyce. But before I go into his testimony, it is plaintiff's position that just considering the testimony that was in the record and has not been stricken, that of Joseph Emery, Dennis Gouge, and Dr. Jay Prisbilla that I just summarized, that that evidence alone would be sufficient to create a question of fact for a jury to decide whether or not the lights being too high were, in fact, a cause of this crash. With regard to David Noyce's affidavit, we believe that the record, then there is no doubt that there is a question of fact on proximate cause that requires trial by jury. On this particular case, Dr. Noyce is an expert in human factors. He has studied human factors in particular as to how they relate to vision, how the brain and eyes work together to see. And he has conducted 200 studies which specifically relate to traffic signals. And Dr. Noyce reviewed all of the evidence in the file, the multiple pictures, the videos, the testimony, and in particular the testimony of Mr. Vila, the driver, to reach the conclusion that the improper height of the lights was a causative factor of this incident. What he looked at is that when Mr. Vila approached the intersection, the lights, because they were out of their normal position, were out of what is called the useful field of vision, that it's an area that the eyes and brain can see. And as a result, that was one explanation as to why Mr. Vila did not see the light as he approached the functioning lights. The second thing is a concept called inattentional blindness. Under this concept, if something is out of the ordinary, the brain, as it's trying to perceive, will put something that's unexpected on the lower level of consideration so that it will not see an object even though it's in plain sight. And Dr. Noyce opined that this was a factor where the lights, because they were not in the right place, not the expected place, they fell out of Mr. Vila's perception and his reactions. And all of these things are based on testimony. It's not conjecture. It's not made up as suggested by defendants. If the affidavit of Dr. Noyce is studied, it shows that his opinions are grounded totally in the description Mr. Vila gave of what happened as he approached the light. And that's specifically Opinion L in his affidavit. And he goes through and he goes through what happened at each moment, what Mr. Vila's reaction was, and how it contributed to causing the accident. It's Dr. Noyce's opinion that when confronted with this unusual situation of lights that were covered and not functioning, that Mr. Vila then looked where he naturally would expect a stop sign to be on the side of the road. And when he saw that, he had to then recycle back his search or cues as to what he should do back to the roadway. However, in that time it took for him to perceive and determine that there was no stop sign, that the lights were not functioning, that there must be something else. He'd exhausted the limited time he had before he reached the intersection. And this is not a case where, like other ones, where Mr. Vila was driving negligently. He was not driving over the speed limit. He testified he was going 30 to 35. It's not a case where Mr. Vila was inattentive. He was looking forward. He looked for the lights. He just happened to see the wrong lights, which put him in a position where he had to search for the proper cues, and in doing so lost and used up valuable time, which led to the crash. So we know, even without Dr. Noyce's affidavit testimony, that there is a question of fact. And certainly with the testimony, which should not have been stricken because it is based on fact, it's not conjecture, it's Dr. Noyce applying his 30-some years of experience and expertise to the facts, that the jury should hear his testimony and decide whether or not there is between the lights being in the wrong position and the accident. With that, I will conclude my prepared remarks, and I'm prepared to answer questions. Thank you. Justice Bridges, do you have any questions? I do. Thank you, Justice. Counsel, so that I'm clear, Vila said he saw the light. And so they were visible. Doesn't that make the proximate cause of this accident Vila's conduct? Vila, certainly his conduct is a contributing cause, but Illinois law is very, very clear that there can be more than one cause to an incident. And in fact, the IPI instruction, 1501, says it can be a combination of causes that lead to an accident. So we believe that in this instance, it was a combination. It was a combination of Vila not seeing the light timely, but also it was the negligence of the defendants in putting the lights in the wrong position contributed because he ended up looking at the wrong light first because it was more conspicuous. It had back plates, which the temporary ones were not required to have. His attention was drawn to the inoperable lights. He was drawn to the position where the light should have been. The new permanent lights were in the proper height. They were in the area that a driver would expect lights to be. So when he looked in that area, he saw the inoperable lights, but did not see the functioning lights, which were too high and out of his field of vision. So I believe under the circumstances that this is an accident that was caused by a combination of factors and not just the negligence of Mr. Vila. Did Vila ever claim that the height of the temporary lights obscured or prevented him from seeing them? No, he did not. What he said was that he looked and he saw the inoperable new permanent lights. Doesn't that make the height of the signal not a cause and effect of the accident? Well, we suggest, Your Honor, that if the lights were in their proper height, they would have been at least three feet lower or more, that they would have been in the same plane as the new permanent lights that were not functioning. So if the signals were in the same plane when Mr. Vila looked where he expected lights to be, he would have seen the functioning temporary lights, and therefore he would have seen the lights in time to have reacted in time to have slowed down. He was only going 30 to 35 and stopped in time before entering the intersection. So the evidence, when especially taken in conjunction with the testimony of all the other experts, the other experts have said it's important. The reason why the MUTCD has a maximum height limitation is to make sure that the lights are in the field of vision. Mr. Embry said that. Dr. Prisbilla said that. Mr. Gouge, who works for IDOT, concurred with that. And that's what Dr. Noyce says. But Noyce gives a little further explanation and says, okay. Well, let me get to Noyce's affidavit. Isn't Noyce's affidavit where he states the unexpected location of the temporary light signal and the complexity of the intersection, the field of view, isn't that all premised on speculation of Vila's state of mind? I would have to respectfully disagree, Your Honor. What that opinion is based on is the testimony of Mr. Vila. Mr. Vila went into very significant detail as to what happened. He said that he approached the intersection. He was looking for the lights. He saw the non-functioning lights covered with tarp. And based on his experience, he believed that there likely would be a stop sign because if a light has been installed but not yet turned on, stop signs are generally placed along the roadway to govern traffic. So he directed his attention from down to the side of the road looking for a stop sign. When he saw none, he made the conclusion that this was a through highway, that the lights weren't functioning, that he must still have the right-of-way. And it was only then that he, at the last moment, as the car started emerging, he saw the light at the same time, but it was too late. So this is not based on conjecture and speculation. Opinions are based on the specific description. Let me ask you this question. Vila said he saw the light, but he mentioned nothing about the complexity of the intersection. That's what Noyce put in his affidavit. Is that correct? He did. And in fact, that was one of the subparagraphs A of the affidavit, and that paragraph was not stricken by the judge. So even the trial judge believes that the evidence showed that, you know, what was Vila facing. Vila did not say, no, it was a complex intersection, but I think just looking at the pictures and the description of Dr. Noyce is that this intersection had a lot of things going on. There was construction. I believe there were some traffic direction drums along the side of the road. There were two sets of lights for every street, so there were eight sets of lights. So it was a very complex array of information that had to be deciphered by Mr. Vila as he approached it. Okay. And counsel, when Noyce stated that the traffic signals were visible to any driver with their eyes open, is that to suggest that Vila was not paying attention as he approached the intersection? No, not at all, Your Honor. What Dr. Noyce is opining, it goes back to the phenomenon that has been identified by scientists like Dr. Noyce called inattentional blindness. It's where if something is unexpected, but in plain sight, that a person may fail to see it because it's not expected. And he gave the example of the experiment they did with people watching somebody bouncing a ball and a gorilla walked back. Half the people didn't. Thank you, Mr. Lomba. Thank you, Justice McClaren. I have no further questions. Thank you. Justice Jorgensen, do you have any other questions? You know, I think my question really goes to how does this become the proximate cause of this accident, as opposed to the condition as the court found? Okay. Well, it becomes a proximate cause. It goes back to what is the current state of analysis of cause and fact versus legal cause, or its two prongs. And I believe that the court relied upon the first prong to say it was not a cause in fact of the accident. It's plaintiff's position that if the lights had been in the proper position, if they had been in the lower position where they should have been, if they had been installed in compliance with the maximum height mandate, that those lights would have been in the same plane, that they would have been in virtually the same line as the new unfunctioning permanent lights were. So that when Mr. Vila looked at the expected place to see traffic signals, he would have seen both at the same time and would have been able to see which was the functioning light and he would have had the opportunity to obey it. So we believe the evidence shows that, and that's the whole reason for the MUTCD, is that if the lights are too high, they're out of the field of vision. I was paying attention. I understand why they're there, what the purpose of the regulations are, etc. So your position is if they'd been, because he saw the non-functioning lights, if the functioning lights or the temporary had been in the same place, he would have seen them and stopped. Correct, correct. If the lights had been in the proper height, it would have been in line with the non-functioning lights and he would have seen them because they would have been where he directed his vision and it would have been within his field of vision and he would have seen them and he would have seen them in time to have stopped and not caused the crash. Okay. So in a nutshell, tell me where you deviate from the trial court's findings. Where we deviate? Well, the trial court, as I understood his opinion, is that regardless of what height the lights were at, whether they were at the proper height or eight feet high, too high, five feet too high, whatever height they were, the lights still could be seen. Therefore, VILA should have seen them and complied with the light. And it's our position that it's a more complex situation than that. And that the lights, because they were in the improper place, were outside of the expected place of vision. And so when Mr. VILA looked in the place where most people would look, you know, the expected place... So the trial court just took the position, look, if all these people traveling through this intersection over the however many months, as we all know traffic construction takes forever, but if all these people going through were able to stop properly, then therefore VILA should have been able to see this light and stop. That's basically it. I mean, I think that the fact of other people seeing it played an influence, but I think it was more of just because they were physically visible at whatever height they were. I would point out that there is testimony of a left turn. She saw the left turn arrow change, giving it green, meaning the light had turned red for southbound I-47. And she saw another car proceed through the intersection while the green arrow was illuminated. And that that driver kind of shrugged and said, oh my God, and then continued on. So that showed that other people had problems. They were just fortunate and didn't have an accident. And likewise, there's a video from Walmart, which shows another snowplow driven by Mr. Pitney, who also went through the same light and the lights on the other side, although measurements were not calculated, they seem to be at about the same height as the ones for southbound. So there were more people who went through, but for the grace of God, they did not have a crash. And the double lights were not up for an extended period of time. The double lights, the new permanent lights were installed in early March. And this accident happened on what, the 14th? So that it was only a two-week period where motorists had to confront the situation. It was not like months and months. Okay. All right. Thank you. I have no further questions. Thank you. Mr. Longblood, are there different kinds of 191 affidavits? I'm not exactly sure. I mean, there are purely fact affidavits. It would be somebody, a witness who might say, you know, like Ms. Fortney, instead of her deposition, might say, I was sitting at the light and I saw this happen. And there are also, I believe, opinion witness affidavits. There are, you know, in every MedMal case or other complex cases, there's testimony of experts. So some facts have to be established through expert opinions. So if that's your question, yes, there are, I believe, two types. One where an expert is establishing facts through opinion and others who are just establishing facts through personal observations. In this instance, Dr. Noyes obviously is establishing facts through opinion based on his review of the evidence and his using that evidence as a foundation for those opinions. So if I understand your answer, there are no 191 affidavits where a layman is given the opportunity to render an opinion that is within his level of expertise that if it is a layman and not an expert, then they are never allowed to give opinions. Is that what you're saying? No, I would, I mean, I believe under 191 that a witness can test, the standard is the same whether you're in court testifying or out of court giving an affidavit that your opinion still has to admissible under the rules of evidence. So if a lay witness were to have an opinion and it was something within the scope of that person's knowledge that a lay person could give an opinion and then you have retained experts who are retained to give opinion testimony based on the evidence in the record. So I believe that a lay person could give opinion if provided it fell within their area of knowledge and expertise. The trial judge was aware that Mr. Noyes was an expert or at least was submitted as an expert. Yes. And did the trial court say that 191 affidavits cannot be affidavits that include an opinion, they can only include facts? You know, the comments of the judge were a little bit unclear. On one hand, he was saying that you know, that he had to testify to facts and, but I know that he was aware that Dr. Noyes was an expert. So, I mean, he made several comments to indicate that he did not believe that Dr. Noyes' testimony was admissible because it was not factual. I mean, there are some cases that use those terms in discussing affidavits, but, you know, for example, in medical malpractice cases, in the case we cited, Brooks versus Illinois Masonic Hospital, you know, when it comes to the issue of proximate cause, a doctor has to give an opinion that in my opinion, the negligence of the doctor caused an injury. And so, ultimately, that's a fact that has to be as I would call it, an opinion fact that the expert says that this is a fact that the negligence caused the injury based on the information in the record and my application of my knowledge and skill to that information. Was the gorilla in the video a real gorilla or was it somebody in a costume? It was, in the video, as I understand it, it was somebody dressed in a gorilla costume who walked behind the two people that were passing a basketball back and forth and in some cases stopped and made gestures to try and draw attention to themselves and yet I think it was around 50% of the people failed to see the gorilla. Is this video part of the record? The video is not. It's just cited by Dr. Noyce as a basis to indicate his knowledge of it. I mean, he is in research in the area, so it just was reflected as an example of his knowledge about this phenomenon called inattentional blindness. Was any of the experts in the area of field of view and what relates to what is deemed to be, I believe, by the camera manufacturer what a normal lens is, which for a 35 millimeter format would be a 50 millimeter lens? I'm sorry, your honor, but I'm not following your question. Well, in the area of photography, you have what are deemed to be normal lenses versus telephoto or wide angle and essentially what they do, the normal lens supposedly presents an image in a perspective that is considered to be normal as opposed to being distorted in some way and when you talk about fields of view for purposes of effective viewing for purposes of stoplights or signage, you're talking about a field of view which can be distorted if in fact you take pictures of these signage or these lights with an abnormal or different lenses, the normal lenses on a 35 millimeter format and so you'll get a distorted view. The eye is a very interesting computer and it can actually filter out different color rays of light that the film will not filter out. That's why you have filters on cameras. So what I'm getting at is that was there any evidence presented as to what is considered to be a normal field of view? You did say something to the effect that the lights are supposed to be 25.6 feet maximum and I think it was 17 feet minimum and is this based upon research that indicates what a person normally looks at insofar as field of view vertically as opposed to horizontally? You know that's a good question. I don't believe that there was any testimony in the explanation as to why there is this maximum height. Mr. Emery who was involved in supervising the drafting of the plans testified that based on his years of being involved in designing traffic light systems, he knew that the height was limited so that the vision or that the lights would not be outside the field of vision of a driver. I'm assuming, I believe that that you know these standards are not put together willy-nilly, that they are based on research and that's how they come up with these standards to be followed because you know it's been put together by the federal department of transportation and is based on I believe research. What Dr. Noyce was talking about is that there is a cone of like usable vision that for example when we read you know we're looking at a small part of the page and likewise when we're driving and looking forward we're looking our focus has a it's called a cone that expands as it goes outward and that if something is outside that cone then it's less likely to be seen and appreciated by a person and it was Dr. Noyce's opinion that the upper end or beyond the field of vision of a normal person as they were approaching the intersection and what he also points out in his report is that if someone is under pressure or has stress that the field of vision shrinks so that a person sees less because their intent and factor here because Mr. Vila after seeing the non-function signals is trying to figure out what what he should do and that the pressure the stress is likely to have reduced his field of vision which made it less likely he was going to see traffic lights that were too high in the air. Did he testify that as he got closer that the lights actually got further and further out of view of this cone? Mr. Vila did not testify to that but what he did testify to is that after he saw the the covered lights that you know his he then perceived however. I didn't mean Mr. Vila I meant Dr. Noyce. In other words the point is I'm six five I sit in a car I can't see many lights simply because I'm so tall sitting in the car that the roof of my vehicle blocks my view of the the lights and if I was a small person where my eyes are roughly at the level of the steering wheel I could easily see the lights and so as you approach an intersection similar to my problem with having to look through the roof did not Mr. Vila did Mr. Noyce opine that Mr. Vila would have more difficulty actually seeing the alternate lights based upon the fact that they would be I believe in his opinions that I mean he did not you know make a specific calculation on that I believe he notes that Mr. Vila was in a truck that's sitting at a higher location and I believe he covers that in yes in opinion E he talks about the physical limitations of the vehicle's front window windshield height as that having an effect on the useful field of vision and I believe in his full report he notes that Mr. Vila because he was in a truck would be sitting higher that that would cause problems similar to what you experience as a taller gentleman of having the making it more difficult for you to see objects that are at a higher level I have no further questions does the panel have any other questions I do not thank you I do not thank you thank you thank you Mr. Lundblad you'll have an opportunity to make the puddle thank you Mr. Teuscher is that how you pronounce your name Fisher your honor Fisher you may proceed thank you may it please the court the Illinois Supreme Court in Brisky rejected the argument that plaintiff makes on the proximate cause issue here if Vila looked at these signals but failed to see them then plaintiff's action against Flody cannot survive Brisky the court there said that the law would not tolerate the absurdity permitting someone to say that they looked and didn't see when the view was unobstructed and this court has also consistently recognized the condition versus cause dichotomy since Brisky in power of this court determined as a matter of law that the height of the sign was not approximate cause of an accident but at most a condition and in Linden Meyer the court said the city's failure to fix a left turn arrow was a condition and not a cause of the driver's decision to turn left in front of oncoming traffic and I know the court will have noticed that plaintiff doesn't rely on any cases out of this appellate district on the proximate cause issue all of plaintiff cases are out of district cases as to cause in fact with the height of these signals a material and substantial element in bringing about this accident and the answer to that is no there were five temporary signals there were two at the height that plaintiff demands a third was nearly within the height that plaintiff demands the driver on v-lift right saw these signals and stopped the driver behind the v-lift saw the signals and stopped and nothing obstructed v-lift's ability to see those signals as to legal cause was it reasonably foreseeable that hanging these signals at this height would result in a driver failing to see all five unobstructed signals would result in a driver failing to further decrease his speed when he was in a known construction zone or would it would it result in him failing to stop at what he believes for a time was an uncontrolled intersection and the answer to those questions is no noises affidavit cannot change the fact that v-lift failed to see those five signals in some voices affidavit is all about look but fail to see and the supreme court has specifically rejected that argument and noise doesn't rely on facts he talks about speculative possibilities what kind of windshield some drivers might see some drivers might not and in fact v-lift's position in the cab of that semi placed him at a higher level and made it easier for him to see those signals than the people traveling behind him and to his right in regular cars and v-lift did not tell the police officer either at the scene or two days later that he was confused instead this is what he said he said it's my fault i had a red light and then he said this i noticed two sets of signals one covered and i thought i had the green light the circuit court got it right that the proximate cause of this accident was not the height of the signal on duty which is another basis that this court can affirm summary judgment the most important provision in clody's contract with idot was at page one two eight five seven where i thought said that its special provisions including its plans that it gave to its contractors took precedence over other standards including the mutcd the issue then is which plans govern the installation of these signals and plaintiff relies on only two things to say that these signals could not be hung higher than 25.6 feet and that is the mutcd and sheet number 80 but the mutcd bowed to the plan that idot gave these contractors here and sheet 80 no one in this case has said that sheet 80 applied to the installation of those temporary signals the only fair reading of this record is that sheet 69 and 70 of the drawings and idot standard specification 88 001 applied to the temporary signal emory said that googe plaintiff relies heavily on emory and googe and both of them said that the plans for the temporary signal were sheet 69 and 88 001 and nowhere on those sheets was there a maximum height called out for these signals if sheet 80 applied to these temporary signals then shouldn't at least one witness in this case have said so and the real proof here lies in the fact that idot gave cody these plans approved the plans and approved the installation of these signals and activated the signals if idot had a question about the height of these signals it would not have approved them it would not have activated them the idot experts were of the opinion that these signals complied with their plans okay i think i've used my time is there any questions justice uh produce do you have any questions i do uh thank you just council uh doesn't the district one note uh that's found in appendix b provide that no traffic send signal ahead shall be higher than the 25.6 feet off the ground and that appendix is the same as sheet 80 your honor and that is a note on sheet 80 but the notes on sheet 80 pertain to different and specific signals you'll note the first note refers to a pedestrian signal the third note refers to the bottom of a signal housing shall be according to current state specifications and then the fourth the fourth note there applies to temporary signals and the only specification with regard to the temporary signals is the 4d.15 applies to permanent signals only according to emory and beneath that section they talk about for permanent signals the bottom of the signal housing shall be at least 15 feet above the pavement but we know that 44 d.15 applies to permanent signals and the fact that it has a minimum height than the temporary signals also indicates to us that 4d.15 applies to permanent signals and not temporary okay in your brief on page 39 you argue that the municipal traffic control device requirements does not indicate that it applies to temporary traffic signals but doesn't IDOT design details that we've been talking about require that the top of any signal not exceed the 25.6 feet no first of all the only IDOT and all of the virtual cooks experts in this area all said the only plans that apply to the temporary signals for sheet 6970 and IDOT standard specification 880001 and on all of those sheets there is no maximum height called out for the temporary signals and that's consistent with IDOT's acceptance of this installation and their approval and activation of the light janikowski said i don't measure the height of the temporary signal and that tells us that that's height so the plans that actually applied to the temporary signals did not call out a maximum height and only called out a minimum height of 17 feet with both of the temporary signals being higher than the 25.6 feet and one that was approaching i believe it was 32 feet in violation and utcd standard couldn't that render the signals in this case less visible to vila you know in theory but that's not what mr vila said what mr vila told the police officer at the scene and two days later was it's my fault i ran the lead red light i saw two sets of signals i thought i had a green light so noises theories aren't supported by what mr vila told these police officers and you know plaintiff's argument that this other car went through the intersection actually the only information we have about that came from witness 40 who said she saw this chevy cavalier try to stop but couldn't and went through the red light and she couldn't tell if she hit it on ice so we don't even know the circumstances surrounding that vehicle and we know that the other signals and obeyed them but isn't this a question of fact as to whether vila could have seen the temporary signal and reacted in time to avoid running the red light no i think that's that's the body of case law and condition versus cause is all about the law does not permit vila to say i looked but i didn't see and again i go back to the fact that two of these five signals were hung in the at the height of plaintiff demands and the third was nearly within that height and mr vila never said that mr vila never said i was confused mr vila never said it took me a long time to find the signal noise doesn't tell us at what height was vila sitting and what was the cone of vision from his height he doesn't tell us when did vila first look at this intersection when did he first notice that there were any signals he also said he had 12 seconds approaching this intersection to find those signals and i would invite the court when the argument is over to sit and count those 12 seconds that's an inordinate amount of time so no i think the law in this area doesn't allow mr vila to say that he looked but didn't see okay the last question i have is it your position that no matter how much higher the installed temporary signals were placed at that intersection it wouldn't be considered approximate cause of this accident no i would never say no matter how high but i would say certainly under the facts that we have in other mr vila's own testimony those signals were visible to him he saw them they were unobstructed and he failed to stop thank you counsel i have no further questions justice clark thank you uh justice jorgensen do you have any questions um i see um somewhat the question that i asked um your opposing counsel i asked him where did where does his theory deviate profound with respect to condition and so my quick how does your analysis of condition versus proximate cause fit into the trial court's findings that's conclusion but it's findings it's finding i think the circuit court stated over and over again that these signals were unobstructed and could be seen by mr vila if he had looked um i think that's more of a cause and fact argument and a little bit of a condition versus cause argument um he you know he said that there was nothing in this record to show him these were obstructed he also said that um noises affidavit was completely speculative and he said know if we if we relied on noises affidavit we would never need a witness we would just need experts to come in and say oh i bet they couldn't see it but here we have a witness who's saying i saw them i didn't stop um and they were unobstructed so i think the circuit court's analysis probably tips a little bit more in favor of cause and fact but i think the precedent in this court and in the illinois supreme court would um recommend affirmance on the condition versus cause as well all right i have no other questions thank you thank you um ma'am your argument seems to hinge on statements made by mr vila is that correct in part the admissions that he made to the police officers um at the scene and two days later i think are crucial uh when he said he saw the second set of lights did he say anything relative to the nature and extent of his perception within a time frame of 12 seconds which according to the speed limit would mean that if he didn't see them in apt time that there could easily be an accident arising out of the expiration of like the game shows on tv uh the most famous one was beat the clock where they were given an indication of the amount of time that they had in order to complete the task and it was a bunch of light bulbs in a circle and so your argument to me fails to take into account the things that he didn't say which the expert did say which relates to the fact that this time frame related to a time period where there was movement in three-dimensional space and there were judgments to be made and unfortunately he did see it but did he say i saw it too late or did he say that i saw other things too early that distracted me your your statement of what his admissions were in my opinion seemed to be equivocal can you explain how his statements are unequivocal and how they establish beyond any reasonable doubt that the premise that you've raised that uh if it's there it must be seen and therefore he is solely the proximate cause or his negligence is the sole proximate cause well first i would say that there's a problem here if noise is relying on something that vila didn't say i mean noise's job is to rely on things that that vila did say so to the extent that noise is creating facts that vila never testified to i think that's a problem and that's part of the reason why the circuit court struck his opinions but beyond that in the supplemental police report vila told the police officer that he noticed that there were two sets of traffic lights one being covered and the other set he stated he thought he had the green light i mean i think that's a pretty equivocal unequivocal pardon me statement that he saw two sets of traffic lights one being covered and the other not uh and and the 12 second um time frame that noise set up assumed a speed of 45 miles an hour and vila testified that he was going 30 to 35 miles an hour so he had more than those 12 seconds to view that intersection see the temporary traffic signals all five of them and bring his vehicle to a stop just like the people to his right and behind him did i have no further questions any other questions from the panel no sir no thank you thank you thank you uh mr esposito you may proceed thank you your honor and may it please the court the subject of the gorilla test the basketball players test came up that's a test that you you can do on youtube if you put in basketball players in gorilla you can pull that test right up and the important thing to know about the test is before it was run the people the viewers are asked to count the number of times the basketball is passed between more than two people it's more like five or six and as you are intently focusing on that basketball being passed you don't see the grow i fell for it myself you know that intentional blindness selective attention may explain things but it doesn't excuse them when you are on the road driving a truck you have to be paying attention to all sorts of things the weather other cars the signals everything that can the construction pattern everything that's out there you need to be and one of the things that were out there were those temporary lights the testimony is those temporary lights could be seen from at least 500 feet back after the intersection you can see those lights in his brief the plaintiff said those lights were conspicuous and easily seen even at their height dr noice said those lights could be were visible to anyone with his eyes open which kind of begs the question of whether mr vila's eyes were open but what what happened here is flame has discounted and really ignored the whole concept of peripheral vision our peripheral vision is big look at any wall from a distance and see how much you see dr noice put in a a demonstrative photograph in fact it is at page one six four nine eight of volume eight and what you can see is that at 30 to 35 miles per hour the driver can see four car lanes and you can see higher than a two-story building that's from dr noice's affidavit we we cannot discount we cannot ignore the fact of peripheral vision what should vela have done out here based upon his own testimony his own testimony was i saw lights that were covered i looked for a stop sign and then i went through but what he should have done is he should have followed the rules of the road which established a standard of care according to this court's own law when under under section 11-305 e of the illinois vehicle code which is probably the same provision that's applicable in every other state it's certainly applicable in texas if you see in operative lights you must treat that intersection as a four-way stop vela here should have stopped his vehicle that's what the standard of care would have required him to do had he merely slowed the vehicle he would have avoided the accident this is bretman's car would have would have gotten through without the collision but he had to follow the rules of the two of those lights were within what twain requires one light was about 11 inches higher another light was about two feet higher the one that was 32 feet up that wasn't even covering his lane so that would not have been a problem that that provision on those on those lights in those heights is really designed to help drivers who are stopped at the intersection they're stopped behind the stop bar and they need to have lights that are reasonably reasonably low so that they can be seen but as we know of course that's not the situation here and and of course the the driver was in a truck which puts him at a higher place it brings us i think to the affidavit of of dr noyce and he was an affidavit in search of facts he talks about extreme weather conditions that weren't there he talks about extremely complex intersection that really wasn't he talks about uh wind light wind blowing the light with no study about that uh the driver's position in the truck with no study about that and ultimately he comes up with this with this you know there are two time periods that had that that vila had to go through and the fact of the matter is from vila's own testimony if he didn't do it that way he saw an operative light he looked for a stop sign he concluded that under everything he knows about driving and he's a professional driver that he had to ride away and as he said i rolled and what he did is he rolled right into this car this this the lights at that intersection were no more than a condition they were they were not the proximate cause the proximate cause of this was the fact that mr vila did not follow the law and did not pay attention to the to the signals that were very obvious to him as a driver as miss tesher said there are a lot of people who made it through this intersection and they made it through just fine you know at the end of the day what what judge myer said is you know mr planer you're you and your expert dr noise are asking me to make a whole lot of assumptions that simply aren't based in the fact and i can't do that the same thing is true here um so we ask this court to affirm are you done i'm done thank you justice bridges do you have any questions i i do thank you uh and i won't uh repeat all my questions that i asked of uh co-counsel or counsel in the other but in this case here mr esposito in your brief on page 29 you raised the argument that defendant did not owe a duty uh in this case uh or the point um that didn't owe a duty was this raised in the trial court you know yes i think there was there was that talk in the trial court and it is well i think what and i i consider that to be a semantical issue i think what's really being said is is there's no duties beyond following the plans and specifications which we did if that's the point you're trying to make your honor that's the subject you're talking about okay and uh with a similar question with both of the temporary signals being higher than 25.6 inches and the mutcd standard uh couldn't that render the signal less visible to vila no i i don't think it does your honor and and for one it's it's this it's the whole concept of peripheral vision um you know i think all of us as drivers is going through untold construction sites have seen has seen the temporary signals they're up there they're generally higher than the staffs that are that are mounted as the permanent signals need to go time constraints of the construction project um and and you just you just know they're there you know that you look for them uh and as you you know if you're approaching this intersection and you're at the 500 feet mark you know away from the intersection you you can see those signals he should be applying himself in in figuring out what to do at that point that's that's though make the placement more than a condition and more likely the approximate cause of the accident no i don't i don't i don't think so your honor because because it it wasn't a substantial factor it wasn't a material factor in in cause and fact and it wasn't likely that that anyone from from virtual coke um and sure from podi uh i'm not speaking for them but i'm sure for them too would have thought that that you're going to ignore lights that were clearly visible it's like the it's like the cases that we cite um you have your duties if you if you're only seeing one set of lights the the the lights that are unoperative you better be stopping at that intersection because that's your duty under the law and that's what people would expect anyone would expect you to do because that's what the law says you're supposed to do thank you miss expedito thank you uh just in spare no further questions thank you thank you uh justice jorgenson do you have any questions um yeah just to follow up on that let your last comment so your position is that vela if he thought this was an uncontrolled intersection he should have stopped right yes okay but didn't he say that he thought had the right of way rather than that he he thought it was uncontrolled well he saw lights that he said were covered so they were inappropriate and he may have thought that he had the right of way but as we know he did not you know the law did not give him the right of way you know if mrs mrs bretman had had did the same thing if her lights were inoperative she wouldn't have the right away and that that rule is there for everyone's safety the lights for whatever reason are inoperative stop your vehicle at the stoplight at the stop bars well if he's seeing an inoperative light because it's covered wouldn't it just as reasonable an assumption to make that this intersection is changing but right now i see lights that govern the other direction but no light that governs my direction so therefore it is not an uncontrolled intersection well he can he's only driving one way he's not driving every other way in the way he's driving those lights are inoperative and also the lights he said he saw so so the decision he has to make as a reasonable driver is i've got to stop because that's what the law tells me to do but only if the entire intersection is uncontrolled correct i don't believe that's what that statute says okay he's only you know because he he he has to make an assumption frankly that if his lights are not working neither are any other lights or else you will have a huge pile up at the middle of the assumes when lights are working i can just go you have a little mess in your hands okay have you completed your answer yes yes i did i'm sorry uh that's okay and i apologize i'm using a cell phone for this or on my computer is whatever it's doing but anyway um but he didn't say that they were inoperable he said they were covered wouldn't that indicate that they just simply were not in service at all or were new well whatever what whatever it would indicate it would certainly indicate that they were not directing his right away they were not telling him because they were covered that it was okay for him to roll as he put it okay those lights are covered for a reason so that so that no signal can be seen from them okay that i believe the testimony is until until that intersection is fully inspected at the end of the project those lights are not even turned on okay all right um you said the duty you owe if any is to follow the contract which is the plan right on the contract from you to floaty from floaty to um i dot correct i i i think it was right i think i heard you correctly yes yes we have to follow the plans specifications that came down from i dot through floaty to us right and your position is that you did that yes and so there cannot be any breach of a duty here yes okay all right i have no other questions thank you thank you um does the vehicle code or the regulations uh defined inoperative i have not seen anything that defines inoperative i i would think that would just be based upon the the the ability of a driver to to pick up a a an intentionally conveyed signal from that light if that's not doing it it's inoperative if all if all three lights were were flashing at the same time red yellow green all of them flashing that's an inoperative signal everyone knows that that signal is not giving a proper message to a driver if a if a if a signal is covered with burlap or tarp or whatever there was and it's not shining any signal that's an inoperative signal i don't know your honor and answer your question whether there are anything that's anything further than that but i think that's the reasonable interpretation that any driver would take well it seems that you and i have a difference of opinion because to me inoperative means something other than being covered with a tarp uh if something is covered with a tarp to me it suggests that it is out of service now being out of service means it's also inoperative but it doesn't mean that it's inoperative to the extent and nature that you've described which is there are other rules that now apply if this was uh or these were lights that weren't in tarps i might buy your argument or if they were lights that were flashing red or yellow or green or whether they're growing through their cycle i think they would be operative to the extent that at least they're giving signals they're not giving the normal sequential signals but your definition of inoperative uh seems somewhat skewed to the extent that you're claiming that it's inoperative because it's covered i'm sorry you didn't finish i'm sorry so explain to me or at least make a better argument if you can why you think that because something is covered it qualifies for the inoperative label for purposes of saying that now everybody has to stop because you're let's let's let's assume that that there was no tarp on those signals or no burlap on the signals we also have to accept this fact that those lights don't get turned on so so you would have a set of lights that were off totally off as if as if a big storm knocked them out right and they didn't have any backup they would be inoperative whether whether whether they're not flashing uh because because of a storm or they're not flashing because they're turned off or they're not flashing for whatever reason they're not they're not giving the signal that that a driver expects to see those those lights are there to require drivers to do things and drivers can expect that they need to do things when they see the operative light that's so you're telling us that this driver was negligent because he looked for stop signs erected uh unpadlocked and unfolded because he saw inoperative lights that were in tarps it would seem to me that it's reasonable to conclude that if the lights were covered with tarps that whoever covered them with tarps probably opened up the stop signs that he was looking for but didn't see because they weren't open or they weren't there so what he's done doesn't strike me as necessarily being negligent if in fact he saw lights not that were just inoperative without tarps but were inoperative with tarps well well yeah i'm sorry you're finished here yes okay you know there's no testimony from Mr. Vela that he was watching lights from other directions that he was watching the eastbound lights or the westbound lights or the northbound lights you know so if he's if he's making the that everyone else's lights were covered in tarp or everyone else's lights were not working and so he goes he goes through but he should have been thinking what if someone else is coming through the other direction uh the cross direction from the east or from the west he should have been thinking about that those that's why that's why the the definition or this discussion about inoperative right has to be a broad one because we're dealing with we're dealing with safety at the intersection of potentially a whole lot of people besides Mrs. Bretman if everyone is moving from all directions thinking they have a right away because because rights aren't telling them what to do we're running out of time unfortunately we're late uh you're making a very good closing argument to a jury i have no further questions uh does the panel have any other questions sir and i didn't hear you i'm sorry no i do not uh george george on mute we may actually have lost him judge hold on okay so have any other questions i do not have any other questions thank you okay thank you uh thank you mr esposito uh mr lundblad you may make rebuttal uh thank you your honor uh i'll just make a couple of points one i believe the court is correct regarding the issue of the lights being covered with tarp it's not a situation where the lights are out and i think that based on our own experience in driving uh that that if a light is covered it right away as mr vila assumed or or a stop sign which he also assumed so i don't think that that is a negligence on his part what what he assumed just the other thing with regard to duty the judge and the trial court assumed that the defendants had a duty to hang the lights in compliance with the mutcd and assume that there was a breach however i would point out that everybody agrees that that the lights had to be installed in compliance with the specification and project documents the project documents say that the mutcd as adopted by the state of illinois was incorporated into the agreement incorporated into the contract and the provisions were to be followed meaning that the section 4d 15 mounting height limitation had to be followed council for ploty did made a reference to another section regarding temporary lights but i would point out that that section does not give a maximum or minimum height but it does say that temporary lights must meet the physical display and operational requirements of a conventional traffic control signal which i believe means it has to conform with section 4d 0.15 the other thing is as council pointed out the specification that applies here is 88001 which relates to span wire mounted signals even though these are temporary signals they were in fact considered to be span wire mounted signals and mr guj the person who approved the plans testified that the mutcd maximum height requirement applies to this specification even though it's not on the drawing itself that it that it does apply the reason that they have a minimum height in the drawing is because district one adopted a different minimum height than the mutcd which is which it has the option to do it makes the minimum height 17 feet rather than 15 feet and that's why it's in the plan but otherwise mr guj testified unequivocally that the mutcd maximum height requirement applies to all span wire mounted signals which would include the signals in question also there was some reference made to drawing number 80 mr janikowski the IDOT person who was at the field and made the inspect inspection he testified that IDOT district one has certain specifications that have to be followed they were included in the exhibit 10 to his deposition and that document says that temporary traffic signal specifications must include appendix b and if you look at appendix b it has the notes and one of the notes says that the maximum height of any traffic signal over the highway is the 25.6 feet and if we look at drawing 80 those notes are incorporated in there and mr janikowski said that the note with the maximum height had to be followed it was a mandate so it's a at worst a question of fact as to whether or not the limitation applied certainly enough to defeat summary judgment on that issue um i would just point out two other things uh one is that uh in his report uh dr noyce reached aero pine that the amount of time available was 10 seconds because the lights due to the curvature in the road as shown by a police video were not visible until a vehicle was that far from the intersection uh and with regard to the comment that two lights were within the zone those two signals were for left turn uh turning cars left turning lanes and would have had no relevance on the movement of mr villa and the one that was over his lane the one that he likely would have been focusing on was a light that was 3.4 feet too high and one should keep in mind that it's the red signal at the top uh is at the top so therefore it was the furthest out of uh the peripheral vision the other thing is um uh council talked about peripheral vision in some ways that's why we have experts because how the eye works how the brain works how vision works in a human being is a scientific subject and dr noyce who has worked in this field for 34 years has described the limitations on peripheral vision the field of vision concept and that his testimony and opinions are should be the relevant ones oh the other last comment is that going to the statements relied upon from the police report uh you know they were they they are statements that were put on paper not by mr villa himself but by the officer uh we do have his sworn testimony where he gave a detailed description of the events and it's the detailed description that dr noyce relied upon and actually he quotes it in his opinions and uh and and that's what the basis is for his opinion so with that your honor i believe that there are questions of fact on proximate cause that defendants had a duty and there's evidence there was breach of the duty therefore we ask this court to reverse the summary judgment for both parties and remand this case back to the circuit court for trial thank you thank you uh justice bridges do you have any questions i do not have any further questions thank you thank you justice jorgensen do you have any questions um just i want to be crystal clear that i understand your position so the trial court assumed that there was a height deviation but found it was merely a condition and your position is through the opinion of dr noise that the height precluded villa from seeing the red light in time is that it in a nutshell uh yes pretty much i mean i would say that the basis for that is also found in the testimony mr emory and and uh mr uh and and uh i guess i would say that instead of the word precluded is that it caused mr villa to see the wrong light first and that it was only after he went through his checklist of things to look at that he looked up and then functioning temporary light but it was too late okay that's all i have thank you thank you i have no further questions george you have a question in response to uh ann's question i do not thank you thank you uh i declare the oral arguments are finished and we will issue a disposition in your clerk will you uh close out the recording in the case thank you